GREAT AMERICAN INDEMNITY COMPANY, ET AL. *v.* BAILEY
AND
BAILEY *v.* GREAT AMERICAN INDEMNITY COMPANY, ET AL.

Series 5-67                                254 S. W. 2d 322

Opinion delivered January 19, 1953.

Rehearing denied February 16, 1953.

470

*Hardin, Barton, Hardin & Garner,* for appellant.

*Gutensohn & Ragon,* for appellee.

GRIFFIN SMITH, Chief Justice. Our first problem is to determine whether the circuit court correctly found that there was substantial evidence upon which Workmen's Compensation Commission made its award to W. H. Bailey and that Great America's policy of insurance comprehended coverage in the unusual circumstances attending the controversy. A secondary issue is the Commission's right to direct payment of emergency treatment when an award has been made and before the primary right to compensation has been judicially concluded.

Day and Nite Cleaners, now incorporated, operated for many years in Fort Smith as a personal enterprise owned by William H. Carter. One establishment is on Rogers street. A second plant is on Grand avenue and a pickup office is maintained at Camp Chaffee. Personnel employment varies from 33 to more than forty and a

quarterly payroll copied in the transcript discloses employment expenditures in excess of $17,000. This includes Carter's salary.

Carter owned 18 acres on Highway 22 east of Ft. Smith where he resides, and where tenant quarters appropriate to operational necessities are provided. The place has long been known as Circle C Ranch. Following the incorporation of Day and Nite Cleaners Carter transferred the so-called ranch property and it became a part of the corporate entity.

By § 81-1302 (c) (1), agricultural farm labor is excepted from the definition of employment, although the exclusion may be waived. See § 81-1307, Ark. Stat's. In the case at bar it is conceded that the notice mentioned in § 81-1307 and more particularly set out in § 81-1308 was not given. Appellant believes Bailey was an agricultural farm laborer and points to the fact that he resided on the ranch, attended stock, made incidental repairs to fences and minor equipage, and was required to report for duty at the cleaning plants only when accumulated work suggested that course to the management. Bailey was paid with Day and Nite checks at $100 per month, but was allowed free use of ranch facilities equal, as the Commission found, to an additional $40 per month.

Bailey's connection with Carter and his enterprises began June 2, 1952, when he replaced L. H. Davis, resigned. Davis had been preceded by Rolen Slaten whose working conditions were substantially the same as those under which Davis and Bailey rendered service accountability, and pay was the same.

Under "Classification" in the insurance policy cleaning or dyeing is covered, including repairing or pressing. Route supervisors, salesmen, drivers, chauffeurs and their helpers, are under Code No. 2586. A subsection (b) includes a risk not pertinent to our review. The total estimated advance premium was $243.15. Item 5 reads: "This employer is conducting no other business

operations at this or any other location not herein disclosed—except as herein stated:—No exceptions.''

The injury for which compensation was awarded occurred June 10th when Bailey fell from a tree while working under Carter's supervision on the 18-acre tract. The accident happened eight days after Bailey succeeded Davis and the injured man had not done any work in the cleaning establishments. It was shown, however, that Davis and Slaten had received periodic calls to work in the cleaning plants. The evidence is that Bailey's duties were not different from those to which Davis had responded; so the issue is whether, as a matter of law, Bailey's assignment to the ranch excluded him from the insurance coverage pertaining to Day and Nite employes. The problem is not without its perplexing phases and no case absolute in factual structure has been cited.

Quite clearly the coverage contracted for is that itemized on the first page of the policy as 1 (a), hence the term ''such injuries'' frequently found in the policy was no doubt intended by the insurer to limit recovery to that class. But we are met with other language that is susceptible of a broader connotation—a construction the insured might with reason have thought to be more embracive than the restrictive verbiage of Item 1 (a). Section 6 expresses the insurer's purposes to make the agreement applicable ''to such injuries sustained by any person or persons employed by this employer whose entire remuneration shall be included in the total actual remuneration for which provision is hereinafter made, upon which remuneration the premium for this policy is to be computed and adjusted''.

Appellant's custom was to check the quarterly returns made by the employer in withholding federal tax estimates, a report that is combined with federal insurance contributions and deductions. For the period ending Sept. 30, 1951, Slaten was listed as an employe. For the quarter closing June 30, 1952, Davis is shown to have been entitled to taxable wages amounting to $343.50. Davis testified that he frequently received overtime payment.

Bailey testified that he was to be available for work at Day and Nite six hours a day—"That's what I was supposed to do, but I hadn't done any work yet because it was the slack season".

The Commission seemingly attached importance to Carter's explanation of ranch operations and why the property was maintained. Prior to 1940 Carter had been connected with Sears-Roebuck Company, but suffered a nervous breakdown and was advised by Mayo Clinic physicians to adopt a hobby. Horseback riding in particular was recommended. The acreage was acquired with this purpose in view.

After entering the cleaning business it occurred to Carter that good will would be promoted by making the ranch facilities available to friends and customers. He specialized in Palomino horses and kept from eight to twelve. These were sometimes taken out of the state and entered in stock shows. To some extent the expense of operating the ranch was met in this manner. Perhaps a little profit had been realized, but in the main the undertaking had just about broken even. Financial matters connected with the ranch were handled through Day and Nite. During summer months some cows were bought and they grazed on pasture lands, but no attendant looked after them except when incidental services were required. It was Carter's belief that the advertising value resulting from maintenance of the ranch more than justified its retention. No crop of any kind—not even a garden—was cultivated.

Appellee calls attention to the fact that all information required by the insurer was procurable by agents who annually checked payrolls in order to determine what additional premium should be charged, and included in such primary and secondary payments was the name of at least one of Bailey's predecessors.

We agree with appellant that the expressions exempting agricultural farm labor is broader than mere cultivation of the soil. But in the case here there was substantial evidence for the Commission's finding, and

circuit court's affirmation, that Carter's corporation was not engaged in an agricultural pursuit within the meaning of the law; and, while the worker whose back was broken when he fell from the tree had not reported at the cleaning establishment, the insurance company with available means for determining classifications and the nature of all risks assumed was willing to rely upon federal tax reports which carried the names of persons whose salaries were included in fixing premiums. We have therefore concluded that the fact-finding agency was not without warrant in holding that appellant had not overcome the verity attaching to the payroll reports and testimony showing business methods and the responsibility of employees.

On November 24th this court entered an order of remand permitting circuit court to reinvest the Commission with jurisdiction to exercise its discretion in directing or declining to direct immediate payment of emergency treatment costs, pursuant to § 81-1311, Ark. Stat's. The Commission took the view that express language of the statute—that is, § 11 of the initiated Act of 1948— deprives it of any authority to require the employer to furnish medical, surgical, hospital, or nursing services before final court adjudication of liability for compensation has been had.

The pertinent paragraph is: ''The employer shall not be liable for any of the payments [provided for in the section] in case of a contest of liability where the Commission shall decide that the injury does not come within the provisions of the Act''.

It is our view that the purpose of the statute was to invest the Commission with discretion to direct immediate assistance when, as in this case, the primary question of compensation had been decided in favor of the claimant. It may be argued that, in the event of appeal and reversal of the Commission's findings, interim expenditures by the employer or its insurance carrier would in many instances be a loss. This, however, does not render the Act invalid for want of due

process. In *California State Auto. Ass'n Inter-Insurance Bureau* v. *Maloney, Insurance Commissioner,* 341 U. S. 105, 71 S. Ct. 601, 95 L. Ed. 788, the U. S. Supreme Court said that the power of a state is broad enough to take over the whole insurance business, leaving no part for private enterprise. It also said that a state's police power extends to all the great public needs, and may be utilized in aid of what the legislative judgment deems necessary to the public welfare, "[and this is] peculiarly apt when the business of insurance is involved."

The court was considering the California Compulsory Assignment Risk Law that provided for approval by the insurance commissioner of a reasonable plan for equitable apportionment among insurers of automobile insurance applicants who are in good faith entitled to, but are unable to procure, insurance through ordinary methods. The plan made it mandatory for all insurers to subscribe to the plan, and the court held that the subject-matter was within the state's police power.

The reasoning of the Maloney case when applied to the state's right to require injured employees to be given medical treatment is quite clear.

The circuit court's judgment upholding the Commission's determination that Bailey is entitled to compensation is affirmed. Its holding that the Commission is without power to direct emergency treatment is reversed.

Mr. Justice WARD dissents; Mr. Justice GEORGE ROSE SMITH concurs.

WARD, J. (dissenting). It is my best judgment, reluctantly arrived at due to sympathy for appellee, that the majority opinion reaches an erroneous conclusion, and that the error is such moment that it deserves comment.

Due to the facts and issues in this case, regardless of whatever view may be taken, appellee is not entitled to recover if in fact he was an agricultural farm laborer as that term is used in Ark. Stats., § 81-1302 (c) (1).

To begin with, *agricultural farm labor* is a broader term than *farm labor*. Many cases have held this to be

true. In the case of *Cook* v. *Massey*, (Idaho), 220 P. 1088, it was stated that the term "agricultural labor" is much broader and more comprehensive than is the term "farm labor." Our statute might be said to include both.

In this case appellee's own testimony and the testimony of his employer [both of whom must be considered interested in recovery] show: Carter, the employer, owned from 18 to 20 acres of land in a rural section on which were located several dwellings and barns; appellee received $100 per month plus a house, lights and gas to feed, water and look after a number of horses and cows and to clean stalls and repair barns and fences; and Carter derived a profit from this operation. Sometimes Carter bought and sold horses and cattle. On several occasions, in his testimony, Carter spoke of the place as his "farm."

In order to determine what definition our courts have given to the terms "agricultural operations" and "farming" we have examined several authorities, among which, are the following: 2 C. J. 988; *Hight* v. *Industrial Commission*, 44 Ariz. 129, 34 Pac. 2d 404; *Greischar* v. *St. Mary's College*, 176 Minn. 100, 222 N. W. 525; *De-Fontenay* v. *Childs*, 93 Mont. 480, 19 P. 2d 650, and *Beyer* v. *Decker*, 159 Md. 289, 150 A. 804. All these cases and authority say that feeding and raising cattle and/or horses comes within the term agricultural farming. In the *Hight* case the court used this language:

"Every standard authority that defines the word 'agricultural' includes in the definition the rearing and care of livestock."

Now let us examine some of the cases presented by appellee to rebut the above array of authority.

1. *Pridgen* v. *Murphy*, 44 Ga. App. 147, 160 S. E. 701. In this case a man who rode over a pine forest to check on the flow of turpentine resin was held not to be a farm laborer. It was stated that the U. S. Supreme Court had held that producing turpentine was not farming.

2. *Carrol* v. *General Necessities Corp.*, 233 Mich. 541, 207 N. W. 831. In this case a man used horses in the

drayage business. In the winter time when he had no use for the horses he kept them in a barn which he rented for the purpose. The court held this was not farming.

3. *Matis* v. *Schaeffer, et al.,* 270 Pa. 114, 113 A. 64. Claimant was employed to work for a party who was engaged in the coal business in a city, but on the occasion when he was injured he had gone out to a farm to do some incidental work for his employer. The court held he was not engaged in farming on the ground that the statute applied to the general character of employment and not to incidental work. Applying the same rule here it must be said that appellee's main or general employment was on the farm and not in the pressing shop.

4. *Mattison, et al.* v. *Dunlap, et al.,* 191 Okla. 168, 127 P. 2d 140. In a per curiam opinion the court held claimant was not engaged in farm activities. The meager facts set forth show that he was engaged in building a garage at the home of an attorney located on 20 acres of land which was covered with ravines and not planted. He did keep a few saddle horses. The decision turned on the statutory definition of a "farm" to be land devoted to agriculture, either to raising crops, or pasture, or both.

We do not possibly see any merit in appellee's contention that (a) the same corporation owned both the farm and the cleaning establishment or (b) that the farm was used to advertise the cleaning business.

(a) If this contention is adopted then John Doe could own a mercantile business in Little Rock and own a cotton farm in Mississippi County and classify both as mercantile.

(b) The admitted evidence is that Carter made a profit from this farm. The general conception of advertising is that it is very expensive. Nor can we see how showing his horses in other states would help his cleaning business in Fort Smith.

It seems to me that the majority opinion should not stand unless the court can present a workable definition of agricultural farm operations by which the facts here

are distinguished from activities commonly known as such. Such an attempt would probably result in confusion and uncertainties.

My fears are that the majority opinion is the beginning of a ''nibbling'' process that could circumvent the clear intent of the statute. In the language of *Pestlin* v. *Haxton Canning Company,* 80 N. Y. S. 2d 869, 274 App. Div. 144, ''This clear and definite legislative purpose must not be 'whittled away by strained construction or false findings'.''